IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **RUSS MCKAMEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **V.** | ) | **Case No. _____** |
| | ) | |
| | ) | |
| **JONATHAN SKRMETTI, Attorney General** | ) | |
| **for the State of Tennessee,** *in his official* | *)* | |
| *capacity*; and | ) | |
| | ) | |
| **CARTER LAWRENCE, Commissioner of the** | ) | |
| **Tennessee Department of Commerce and** | ) | |
| **Insurance and State Fire Marshal,** *in his* | ) | |
| *official capacity*; | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

---

Plaintiff Russ McKamey submits the following for his Complaint against Defendants Jonathan Skrmetti and Carter Lawrence both in their official capacities:

### I.    INTRODUCTION

1.    Mr. McKamey moved to Summertown, Lawrence County, Tennessee in 2017 where he continued activities related to the McKamey Manor – an immersive theater experience in the genre of horror – on his property.

2.    On July 15, 2017, a "Community Alert" was posted online by Lawrence County Commissioner, Scott Franks, stating, "We are actively exploring our options on getting this

operation shutdown [...] County Executive Williams, Sheriff Brown, County Attorney Holt and District Attorney Cooper are all involved in this effort."

3.      Because Mr. McKamey's property is located in unincorporated territory, public retaliation against Mr. McKamey was limited.

4.      Lawrenceburg Police Department entered Mr. McKamey's property around that same time in response to a report by Mr. McKamey's neighbor.

5.      On July 20, 2017, a meeting was held between Mr. McKamey and Twenty Second Judicial District Attorney Brent Cooper, during which Mr. Cooper recited the law in Tennessee for false imprisonment and kidnapping based on reported activity occurring on Mr. McKamey's property related to the "McKamey Manor."  Mr. Cooper later stated in a news interview that Mr. McKamey is walking "a very fine line."  Mr. Cooper advised Mr. McKamey in the July 2017 meeting, "I won't let those lines be crossed here."

6.      On March 29, 2018, Jeff Dunn, Criminal Investigator for the Twenty Second Judicial District Attorney's Office, was permitted onto Mr. McKamey's Summertown property to interview Mr. McKamey and investigate claims surrounding the "McKamey Manor."

7.      In 2023, the concerted effort to prevent Mr. McKamey from engaging in lawful conduct on his private property escalated into a sprawling investigation by the Tennessee Attorney General's Office, which Defendant Skrmetti announced through a post to his Twitter account on October 31, 2023.

8.      Defendant Skrmetti's investigation arose after a Hulu Documentary about McKamey Manor – entitled "Monster Inside: America's Most Extreme Haunted House" – premiered on October 12, 2023.

9. Relying on T.C.A. § 47-18-106, Defendant Skrmetti issued a Request for Information ("RFI") to Mr. McKamey on November 15, 2023 containing 18 requests for production of documents, 28 interrogatories, a demand to appear for sworn testimony, and an Affidavit of Compliance to attest to the accuracy of the written responses. The RFI states, "The State has reason to believe that Russ McKamey and McKamey Manor are engaging in, have engaged in, or are about to engage in unfair and deceptive acts or practices in violation of the Tennessee Consumer Protection Act of 1977 [("TCPA")] [...] in connection with McKamey Manor's unfair and deceptive practices towards consumers."

10. Although each violation of TCPA alone is a Class B misdemeanor under T.C.A. § 47-18-104(a), the RFI seeks information far beyond any question of fairness or deception related to a purported consumer transaction and closely related the allegations of a more serious criminal nature made in the Hulu Documentary.

11. On the same day that Mr. McKamey received the RFI, an anonymous complaint was filed with Defendant Lawrence's office resulting in an inspection of Mr. McKamey's property on November 21, 2023. After the inspection, Chief Counsel for Fire Prevention Ben Conrady and Assistant Commissioner of Tennessee Department of Commerce and Insurance Gary Farley advised Mr. McKamey that "continued inspections will occur" until a sworn affidavit attesting to three code violations – each a Class C misdemeanor – despite no such affidavit being required by any law in Tennessee.

12. Defendants seek to score political points by riding the coattails of a sensationalized, one-sided Hulu documentary and suspend Mr. McKamey's rights as a private citizen along the way.

3

13. Defendants coordinated targeting of Mr. McKamey thinly conceals – and, in part, admits – its interest in creating long-sought criminal exposure for Mr. McKamey for offenses spanning the full spectrum of criminal liability in Tennessee from Class C misdemeanor to Class A felony.

14. This action seeks to halt Defendants' concerted effort to further violate Mr. McKamey's constitutional rights including, but not limited to, the right not to be compelled to self-incriminate, the right to be free of warrantless searches, the right not to speak, and the right to be free of retaliation for constitutionally protected conduct.

15. Defendants are free to investigate whatever they and other State leadership believe to be within the scope of their duties to protect the public, but they cannot be permitted to disregard Mr. McKamey's rights in the course of such investigation.

## II. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983.

17. Mr. McKamey's claims for declaratory and injunctive relief are authorized by 28 U.S.C. § 2201, by Federal Rules of Civil Procedure 57 and 65, and by the legal and equitable powers of this Court.

18. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this judicial district and all of the events giving rise to Mr. McKamey's claims occurred in this judicial district.

## III.    PARTIES

19.    Plaintiff Russ McKamey is an individual who resides at 12 Stephenson Road, Summertown, Lawrence County, Tennessee 38483.

20.    Defendant Jonathan Skrmetti is the Attorney General & Reporter for the State of Tennessee ("AG").  He is named as a Defendant in his official capacity.  Defendant Skrmetti is charged by the General Assembly under T.C.A. § 47-18-106 with investigating and prosecuting violations of the Tennessee Consumer Protection Act on behalf of the State and the public.  The exercising of such authority in his official capacity in this case has directly caused the injuries to Mr. McKamey discussed herein.  All conduct by Defendant Skrmetti discussed or referred to in the following paragraphs occurred in the course of his exercising powers provided by state law. Defendant Skrmetti has exclusive authority to enforce the Tennessee Consumer Protection Act on behalf of the public and conduct investigations under T.C.A. § 47-18-106.

21.    Defendant Carter Lawrence is the Commissioner of the Tennessee Department of Commerce and Insurance ("TDCI") as well as the State Fire Marshal.   He is named as a Defendant in his official capacity.  Defendant Lawrence is charged by the General Assembly under T.C.A. § 68-102-116 to directly, and through his deputies and assistants, "perform the duties" under Chapter 102 of Title 68 of the Tennessee Code Annotated – entitled "Fire Prevention and Investigation" and "Health, Safety and Environmental Protection" respectively. The exercising of such authority in his official capacity in this case has directly caused the injuries to Mr. McKamey discussed herein. All conduct by Defendant Lawrence, other TDCI policymakers, or their agents discussed or referred to in the following paragraphs occurred in the course of TDCI exercising powers provided by state law.

5

# IV.    FACTS

22.    "McKamey Manor" does not operate and has never operated under or as an entity in the State of Tennessee.  All information sought in the RFI is personal information belonging to Mr. McKamey.  (*See* Exhibit 1: Affidavit of Russ McKamey at ¶ 8).

23.    On October 12, 2023, the streaming service Hulu released a documentary entitled "Monster Inside:  America's Most Extreme Haunted House" ("the Documentary"). (*Id.* at ¶ 2).

24.    On October 31, 2023, Defendant Skrmetti announced this investigation into McKamey Manor via the following post from his Twitter/X account:



(*Id.* at ¶ 5).

25.    Although Defendant Skrmetti apparently did not know that the @McKameyManor account was created and operated by a fan, not by Mr. McKamey, Defendant Skrmetti clearly communicated that he believes Mr. McKamey to have violated the Tennessee Consumer Protection Act and to be a danger to the "safety and wellbeing" of the public and the guests of McKamey Manor.

6

26.    Also on October 31, 2023, Mr. McKamey received a letter from Defendant Skrmetti's office stating, in part, the following:

> This office is responsible for protecting the public interest, including enforcing consumer protection laws in Tennessee.
>
> [...]
>
> We are concerned by recent reports regarding McKamey Manor and its practices. Specifically various sources and reports allege that:
>
> > McKamey Manor either does not offer, or honor, a means for a participant to stop the tour. In Hulu's 2023 documentary about McKamey Manor, you are quoted as saying, "we're known for no quitting and no safe wording."
> >
> > Participants do not have access to the lengthy waiver that describes the risks involved with a "tour" before signing up, traveling long distances to Tennessee, or even before the tour begins. Former participants describe the adrenaline and pressure they felt when reviewing the waiver at the start of the tour. One interviewee from the Hulu documentary stated, "I had too much excitement going through my veins at the time. If [the waiver] would have said that a man is going to come out of the woods and murder you during this event, I would've signed it.

(*See* Exhibit 2: 10-31-23 Letter; Exhibit 1: McKamey Aff. at ¶ 6).

27.    On November 15, 2023, Defendant Skrmetti signed and delivered a "Request for Information Issued Pursuant to Tenn. Code Ann. § 47-18-106" ("RFI"). (*See* Exhibit 3: RFI). The RFI states, in part, "You are required, pursuant to Tenn. Code. Ann. § 47-18-106(a)(1), to respond in writing to the attached Requests for Production of Documents and Information and provide a Written Statement Under Oath [...] by completing the attached Affidavit of Compliance." (*Id.*; *Id.* at ¶ 7).

28.    The RFI further states, "You are required pursuant to Tenn. Code Ann. § 47-18-106(a)(2), to provide one or more witnesses who are knowledgeable about McKamey

Manor's practices in Tennessee, the responses to this Request for Information, and the defined subject areas for the purposes of providing testimony under oath[.]" (*Id.*)

29.     The RFI further states, "This [RFI] is made pursuant to Tenn. Code Ann. § 47-18-106 in connection with an investigation by the State of Tennessee, through Jonathan Skrmetti, Attorney General and Reporter (the State) [...] The State has reason to believe that Russ McKamey and McKamey Manor are engaging in, have engaged in, or are about to engage in unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act of 1977 (TCPA)." (*Id.*)

30.     The RFI further states, "Unless otherwise indicated, documents to be produced pursuant to this Request include each and every document prepared, sent, dated, received, in effect, or that  otherwise came into existence during the period from January 1, 2017 to the date of the production of the documents [...] Similarly, Your response to an information request should include information addressing the period from January 1, 2017 to the date of your response to the request." (*Id.*)

31.     Each violation of the Tennessee Consumer Protection Act is a Class B misdemeanor under T.C.A. § 47-18-104(a).

32.     As implied by the 10-31-23 Letter, the RFI seeks information beyond the scope of a purported consumer transaction, including, but not limited to, the following explicit requests:

- 22.     Identify any and all procedures you and/or Agents of McKamey Manor have to monitor the health and safety of Participants while they are participating in a Tour.

- 23.     Has McKamey Manor ever facilitated medical treatment for a Participant?

- 24.     To your knowledge have any Participants sought medical treatment soon after participating in a Tour?  If so, identify in a list form the name(s) of the Participants(s) and the injuries, if known.

8

(*Id.*)

33.     On January 16, 2024, Assistant Attorney General Kelley Groover – who was copied on both the 10-31-23 letter to Mr. McKamey on behalf of Defendant Skrmetti and the RFI – stated on a video conference, "Obviously there was quite a bit of reporting, um, around the release of the recent Hulu documentary, and that definitely is a factor in us taking a closer look."

### *The Documentary*

34.     The Documentary featured five individuals who had been a guest of the "McKamey Manor" at some point.  Being a "guest" of the "McKamey Manor" means to take the tour – in other words, to be a participant for whom the immersive experience is designed.  All but one of the five individuals had taken the tour multiple times.

35.     Mr. McKamey did not participate in the Documentary.  (*See* Exhibit 1: McKamey Aff. at ¶ 2).

36.     The Documentary used footage of the tours of the five individuals, and others, which was taken and posted online by Mr. McKamey.

37.     The Documentary also used stock footage that had nothing to do with "McKamey Manor."

38.     The central claim of the Documentary is that "McKamey Manor" is a unique aberration or anomaly in the immersive horror experience landscape in a way that makes it a criminal enterprise.  (*See* Exhibit 1: McKamey Aff. at ¶ 3).

39.     W.P. West, a self-described "producer and creator of immersive horror" participated as a subject matter expert in the Documentary and stated, "[I]t isn't just torturing people [...] There is subtext to the show [...] There is subtext to the things I'm talking about [...] But, that isn't always the case [...] There's one person basically running a torture chamber."  The

Documentary then shows a clip of Mr. McKamey. West further stated in the Documentary, "If people want to do it, I'm not going to stop them, but it's not going to shock me if someone dies one day and [Mr. McKamey] goes to jail because of it." (*Id.* at ¶ 4).

40. Dr. Lindsay Bira, a self-described "Clinical Health Psychologist and PTSD and trauma specialist" participated as a subject matter expert in the Documentary and stated, "I'm worried about these types of experiences because there's no real structure [...] There's no real limits [...] The limits keep getting pushed [...] But, the most important thing is to be very careful who is leading an extreme experience [...] There can easily be an abuse of power and we don't know how far to trust somebody." (*Id.*)

41. Melissa Everly, a repeat guest of "McKamey Manor", stated in the Documentary:

I drive down for the second tour. Russ ends up coming over to the hotel room. And I knew from the Youtube videos this isn't the first time he's been in somebody's hotel room.
[...]
The conversation ended up taking a turn kind of for the worse. He started going into his sexual history with past contestants. Talking about how he liked a very competitive outgoing girl, but he wants a woman that's going to submit to him when it comes to being aggressive during sex. In that moment, I was feeling very nervous. Like, I'm just there. I'm barely participating in conversation because I don't really know what to say. I don't want to give any leading responses because I just wanted to go through the Manor. I was tired. I was exhausted. I was willing to listen to him, but I was also scared that if I was propositioned, I'm not going to be able to have this experience if I decline.
[...]
My brain was like mashed potatoes when he picked me up when he came and picked me up and we headed out to go for my next tour. It's just me and Russ on this tour. He had no helpers. Through the bamboo run is when he started, like, whispering in my ear and, like, complimenting my neck and kind of grabbing my neck and being sexual. But, in that moment, I'm like, 'Oh this is part of the tour.' You know, this is part of what he does. I was dead to the world. By the end of it, I was over 30 hours no sleep. I was beyond sleep deprived. I remember at that point, I had fell asleep, and he told me it was fine to go to sleep. He covered me up with towels.
Well, sometime after the tour, and I'm going to fast forward for a moment because I asked him how the footage went, and he was like, 'Well, there was this one time that I didn't get the footage I really wish I had.' What happened? What did he do

10

when I was asleep? Because he never answered me, and I think I deserve the right to know. Like what did he mean? What footage did he miss? That's always going to haunt me. I will question myself that until the day I die. 'Cause I don't want and I never have wanted to do anything with Russ. And, just the fact that that may have been a possibility disgusts me. He is a cruel, fucking disgusting person.

(*Id.*)

42. Kris Smith, a repeat guest and former assistant at "McKamey Manor" stated in the Documentary his response to this account from Everly, "There's always gonna be that doubt [...] There's always gonna be that doubt." (*Id.*)

43. When asked by Documentary director Andrew Renzi, "Why did you decide to do this?" Everly stated in the Documentary, "I am here because I want everyone to know the truth about [Mr. McKamey]." (*Id.*)

44. Gabi Hardiman, a repeat guest of "McKamey Manor", stated in the Documentary, "You can have your kinks and that's perfectly fine, but don't invite people into your kinks without them knowing that that's exactly they're going to be in [...] If I knew that I was getting into [Mr. McKamey's] fantasy world and living out whatever fantasies he wanted to see, I would probably would have felt different about it, but I was supposed there to survive my own horror experience, not survive Russ McKamey's fantasy experience." (*Id.*)

45. The Documentary plays a clip of Mr. McKamey performing with a band during the Captain's Pizza Party on the USS Independence CV 62 in 1993 while he was in the United States Navy. In the selected clip, Mr. McKamey is shown playing as the frontman of the band and singing, "I really, really, really, really, really, really, really, really like girls [...] Yeah, I really, really, really, really, really, really, really, really like girls." (*Id.*)

46. Brandon Vance, a repeat guest of McKamey Manor, stated in the Documentary, "The dude lives in the dark [...] The world needs to see what this man has done to people." (*Id.*)

47. Vance further stated in the Documentary, "McKamey Manor was 'Tinder' to him [...] Was his 'Plenty of Fish' [...] That's what he used it for [...] That's the impression that I got." (*Id.*)

48. Kris Smith stated in the Documentary, "He was my friend [...] Like, I don't want to think that he would actually purposefully manipulate these women, but he does." (*Id.*)

49. Beyond explicitly claiming that Mr. McKamey is a serial sexual offender of guests to McKamey Manor, the Documentary on which the RFI is based claims that Mr. McKamey has fraudulently obtained, violated, and/or gone beyond the guests' consent to a wide range of other risks and physical injuries in the tour.

### *The Documentary and The McKamey Manor Waiver*

50. Smith further stated in the Documentary about his time assisting with McKamey Manor, "His phone would constantly ring, and my phone would constantly ring with people trying to get in [...] It was insane how quickly and how big it got [...] And that's when it got violent." (*Id.*)

51. The McKamey Manor Waiver is the document whereby Mr. McKamey obtains each guest's express consent to everything they will experience during their tour.

52. Everly states in the Documentary, "I went to meet Russ at the park for my waiver signing [...] I was nervous [...] I was shaking [...] My hands were trembling, and I was trying to fake that I was fine." Documentary director Andrew Renzi asked Everly, "Had you signed the waiver ahead of time already?", to which she replied, "No." Renzi then asks her, "Ok, so you were signing it on the spot?", to which she replied, "Yes." (*Id.*)

53. Vance states in the Documentary, "That was the infamous waiver [...] That was the waiver that you're basically signing your life away." (*Id.*)

12

54.     Hardiman paraphrased the waiver in the Documentary and stated, "We're not responsible if you die, like, you're agreeing to sign up for this." (*Id.*)

55.     Vance read from a copy of the waiver in the Documentary, stating, "Participant fully understands and agrees that once participant enters MM there is no quitting unless serious psychological injury is present."  Vance went on to quote from a list of potential injuries to which guests of McKamey Manor consented by signing the waiver, "Head, neck, back injuries; death; stroke; traumatic brain injury; brain aneurysm [...] retinal hemorrhage; subdural hematoma; loss of consciousness; whiplash; harmful heart reactions; nausea; headache; dizziness; lacerations; broken or sprained bones." (*Id.*)

56.     Regarding the process of signing the waiver, Hardiman stated, "I wasn't allowed to, like, look at the person who gave us the waiver [...] We had very weird instructions."  (*Id.*)

57.     Haridman further stated, "I don't know how he's still able to legally do this because I don't feel that it's legal." (*Id.*)

58.     Regarding the process of signing the waiver, Everly stated, "I had too much excitement running through my veins at the time [...] If it would've said a man's gonna come out of the woods and murder you during this event, I would have signed it." (*Id.*)  Defendant Skrmetti's office quoted this statement in the October 31, 2023 letter to Mr. McKamey.  (*See* Exhibit 2: 10-31-23 Letter).

59.     Smith stated in the Documentary, "That camera, when that camera is in front, your limits are gone [...] Anything that you sign thinkin' that you were getting into and those were the rules that were set in place, those don't exist."  (*See* Exhibit 1: McKamey Aff. at ¶ 4).

60.     In response to the question from Director Andrew Renzi, "Was there one that really made you realize, like, 'oh my god?'" Smith further stated in the Documentary, "So, it was

a person that they sent me photos I hadn't seen [...] And it was the photos of Lori. I'm seeing this girl that was just beaten like a gang initiation [...] When I saw these pictures of Lori, I –I couldn't do it anymore." (*Id.*)

61. In response to the question from Director Andrew Renzi, "Do you think that Russ's behavior could be construed as criminal?", Vance stated, "Yeah absolutely, I– whenever he's physically abusing the females who he entraps in his house." (*Id.*)

62. In response to the question from Director Andrew Renzi, "Was there ever a specific moment where you revoked consent and things still kept happening?", Hardiman stated, "Maybe the spider [...] But, I don't think I made it clear with anything else that I was like, not consenting. I didn't really feel that I could say that, though 'cause I signed the waiver." (*Id.*)

63. Alka Pradhan, a self described "Human Rights Attorney practicing at Guantanamo Bay and before the International Criminal Court" "employed by the Department of Defense" whose "expertise is in working with torture victims", participated as a subject matter expert in the Documentary and stated, "Personally, I am really repulsed by the idea of anyone using torture or acts that simulate torture in a way that is entertaining [...] Nothing about torture is entertaining [...] The first thing to keep in mind is that all torture has psychological effects [...] Even if you consent to some aspect of that, the fear created in your mind, what psychologists often call 'uncontrollable stress' can literally change your neural pathways [...] And, it's something that is almost impossible to remove." (*Id.*)

64. In response to the question from Director Andrew Renzi, "Why do you think Russ hasn't been criminally charged with anything or anyone's actually gone after him substantively?" Pradhan stated, "There may be an element of shame in the fact that you signed up for this

14

experience, um, in this sense that you kind of brought on yourself [...] But, under the law, even if they have signed a waiver, they may still have recourse for what was done to them." (*Id.*)

65. Pradhan further stated in the Documentary, "It is certainly possible when you attend, for example, a haunted house, to consent to certain acts that may cause fear or that may even touch you in what would otherwise be considered offensive contact or battery [...] But the line is drawn when something constitutes serious bodily injury [...] Examples of that would be traumatic brain injuries, fractures, back injuries, and psychological injuries that require prolonged treatment [...] So it is not possible for someone to say, 'Yes, I am okay with permanent physical or psychological damage [...] Even if they say that, under the law, that cannot be valid [...] But, the other aspect of it is that it's a violation of your consent, if, for example, your mouth is covered so you cannot say the safe word, or the circumstances in that situation are such that you really couldn't reasonably be expected to remember or be able to say a safe word but are acting in other ways that make it very clear that you've withdrawn consent, then I think [McKamey] may have a real problem." (*Id.*)

66. The Documentary – from which Defendant Skrmetti's investigation was admitted to have been born and on which it relies – is explicitly and emphatically making the case that Mr. McKamey could and should be criminally charged with a range of felonious conduct including, but not limited to, especially aggravated kidnapping (A Felony), aggravated assault (C Felony), aggravated rape (A Felony) among a number of other conceivable offenses not excluding versions of attempted homicide.

*The TDCI / Fire Marshal Investigation*

67.     The same day that Defendant Skrmetti issued the RFI – November 15, 2023 – an anonymous complaint was filed with Defendant Lawrence's office.  (*See* Exhibit 4: 2023 Codes Complaint).

68.     The only specific information supporting the Complaint was "the barn is being used as a special amusement facility."  This means that whoever filed the Complaint had to know about a previous Complaint filed on November 18, 2019, which was resolved by agreement that Mr. McKamey that the barn would "no longer be used for the McKamey Manor shows."  (*See* Exhibit 5: 2019 Inspection Report).  The term "special amusement" is an arcane term of art from the Chapter 202 of the International Fire Code.  That Mr. McKamey's barn was even considered a "special amusement building" was a determination reached in the resolution of the first complaint in 2019.  (*Id.*)

69.     On November 21, 2023, Defendant Lawrence's office conducted an inspection of Mr. McKamey's property through which it was alleged that four codes violations existed: (1) "automatic fire detection system has not been installed in the bar and CONNEX [sic] in accordance with Section 907 of the IBC"; (2) "Exit signs have not been installed at required exists in the bar and CONNEX [sic] box"; (3) "Emergency voice/alarm communications systems has not been provided in the barn or CONNEX [sic] box; and (4) "A portable fire extinguisher has not been provided".  (*See* Exhibit 6: 2023 Inspection Report).

70.     Each such allegation constitutes a Class C misdemeanor under T.C.A. § 68-102-113(g).

16

71. After the inspection, Defendant Lawrence's office requested that Mr. McKamey execute an Affidavit admitting to these building code violations and swearing he would not use certain parts of his property. (*See* Exhibit 7: 12-15-23 Email).

72. On January 8, 2024, Associate Counsel for Fire Prevention stated she did not know the authority for requiring the submission of an affidavit but would research and confirm.

73. On January 30, 2024, Associate Counsel for Fire Prevention stated, "The Department's authority in this matter is in Tennessee Code Annotated Title 68, Chapter 120, and all rules promulgated thereunder."

74. No provision of Chapter 120 of Title 68 or other rule requires the submission of an affidavit after an inspection.

75. In response to a repeated request for authority – accompanied by the citation of T.C.A. § 68-120-117 outlining the administrative inspection warrant requirement and process – Chief Counsel for Fire Prevention intervened and stated, in part:

> Mr. McKamey is not required to bring the barn into compliance with adopted codes and standards so long as he does not use the facility for anything beyond storage. As you are aware, the SFMO ***suggested*** that Mr. McKamey complete an affidavit stating that the barn and CONEX boxes would only be used for storage. Such action would constitute an acceptable POCA and the complaint would be closed.

> Currently, the complaint against Mr. McKamey's property remains open. At the direction of Assistant Commissioner Gary Farley, ***continued inspections will occur*** until an acceptable POCA is received, or the facility is brought into compliance with adopted codes and standards and inspected by the SFMO.

(*See* Exhibit 8: 2-2-24 Email) (emphasis added).

76. These threatened inspections in violation of Mr. McKamey's right to be free of warrantless searches under the Fourth Amendment are in direct retaliation to Mr. McKamey asserting such right and to Mr. McKamey asserting his right against compelled speech.

17

77.     Assistant Commissioner Gary Farley is a policymaker for the Tennessee Department of Commerce and Insurance.

78.     Chief Counsel Ben Conrady is a policymaker for the State Fire Marshal.

79.     But for Mr. McKamey exercising his First and Fourth Amendment rights, Defendant Lawrence's office would not have stated that warrantless "continued inspections will occur" until he complied with the demand.

80.     The fact that the Assistant Commissioner and Chief Counsel for Fire Prevention became involved in a situation as small, on its face, as this anonymous complaint is indicative of coordination between the Defendants and an ulterior motive on the part of Defendant Lawrence for insisting on a sworn affidavit from Mr. McKamey.

81.     Because this affidavit was admitted to not be required by any law under the circumstances, the only reason to have Mr. McKamey sign such an affidavit was, at least, to construct a perjury trap for him.  If connected to an official proceeding, such a trap would create Class D felony exposure for Mr. McKamey.  *See* T.C.A. § 39-16-703.

82.     Both Defendants are trying to force Mr. McKamey to execute sworn admissions to criminal conduct.

### *The AG Investigation*

83.     On January 5, 2024, through counsel, Mr. McKamey expressly invoked his Fifth Amendment privilege not to participate in or respond to the RFI.  (*See* Exhibit 1: McKamey Aff. at ¶ 10).

84.     In attempting to secure compliance with the RFI, Defendant Skrmetti's office has repeatedly claimed, in one way or another, that the goal of the investigation is simply "to gather information to determine whether a violation of the law has occurred or not."

18

85. Accordingly, it was proposed to Defendant Skrmetti that the information sought by the RFI could be provided by Mr. McKamey's counsel outside the RFI process – thereby satisfying the purported goal of the investigation without waiving Mr. McKamey's privilege or exposing him unnecessarily to potential criminal liability.

86. The response from Defendant Skrmetti's office was, "How do I authenticate in court? Who is going to attest to the authenticity of those things?"

87. Authentication is only a concern if the information is being gathered for the purpose of exhibition in a legal action.

88. In addition to verified written responses and document production, Defendant Skrmetti demanded Mr. McKamey appear in person on April 8, 2024 to provide testimony in response to the RFI.

89. Providing documents, information, and testimony all under oath to Defendant Skrmetti is absolutely not necessary for him to conduct this investigation. Such attestations are, however, necessary to both remove evidentiary safeguards to admissibility in a subsequent legal action, lay a perjury trap for Mr. McKamey, and discover information – under these circumstances – which could lead to criminal prosecution.

90. T.C.A. § 47-18-5002 actually ***requires*** Defendant Skrmetti to "[l]end assistance to any district attorney general who elects to criminally prosecute any person for any criminal act or practice" discovered in the investigation. Such cooperation is not, under the law, discretionary were the local district attorney to elect to prosecute Mr. McKamey on evidence arising from the AG investigation. Regardless, however, of *who* were to prosecute Mr. McKamey, the possibility of prosecution arising from the claims informing the RFI and information sought thereunder are, broadly speaking, very real.

19

91.     On January 22, 2024, Defendant Skrmetti's office stated its skepticism about the enforceability of the McKamey Manor Waiver.  The 10-31-23 Letter from Defendant Skrmetti's office had already expressly accused Mr. McKamey of violating the consent of McKamey Manor guests. (*See* Exhibit 2: 10-31-23 Letter).

92.     This accusation clearly exposes Mr. McKamey, from law enforcement's point of view, to every conceivable criminal offense that, but for the guests' consent, could be said to have occurred.  As the Documentary claims, this includes potential criminal offenses to which consent was never possible in the first place.

93.     The statute of limitations for a Class A Felony in Tennessee is "fifteen (15) years."  (*See* T.C.A. § 40-2-101).  The statute of limitations for a Class B Felony in Tennessee is "eight (8) years."  (*Id.*)  The statute of limitations for Class C and D felonies in Tennessee is "four (4) years."  (*Id.*)  The State can also toll any applicable criminal statute of limitations under long-standing Tennessee jurisprudence.

94.     In a Channel 5 WTVF interview in 2017, District Attorney Brent Cooper – in whose jurisdiction Mr. McKamey's Summertown property sits – stated that but for the apparent consent of the guests, Mr. McKamey was "doing things to people that would otherwise be crimes – serious crimes in some instances."

95.     In a Channel 2 WKRN interview in 2019, Cooper further stated, "You have someone tied up and bound and gagged and they give the safe word…if you don't release them at that point, then you are potentially looking at kidnapping from having them confined like that against their will."

96.     The Documentary – upon which Defendant Skrmetti's investigation admittedly relies – claims that certain aspects of McKamey Manor are not even amenable to consent in the first place.

97.     Aside from Title 39 Chapter 13 criminal offenses, the RFI seeks to have Mr. McKamey provide information under oath that would, in Defendant Skrmetti's express opinion, constitute violations of the Tennessee Consumer Protection Act.  Each such violation constitutes a Class B Misdemeanor.

98.     What Defendant Skrmetti deliberately ignores, is the obvious possibility that information sought under oath by the RFI ***could lead to the discovery*** of evidence that could be used against Mr. McKamey.  Even if direct use of the information sought under the RFI is barred by some statute of limitations, all such information could furnish a link in the chain of evidence that could lead to prosecution.

99.     Because Defendant Skrmetti stated in the RFI that the "State has reason to believe that Russ McKamey [has] engaged in unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act" every question that follows is designed to elicit information that could be used to criminally prosecute or could furnish a link in the chain of evidence to prosecute Mr. McKamey for Class B misdemeanors.  (*See* Exhibit 3: RFI).

100.    Defendant Skrmetti's office admitted that the investigation, including but not limited to the RFI, arose from the Documentary.

101.    The RFI seeks information related to claims against Mr. McKamey of far more serious offenses as discussed in the Documentary.

102.     Regardless of whether Defendant Skrmetti intends to directly pursue information relating to the serious offenses in the Documentary, the RFI will necessarily include information

21

that could be used by law enforcement for that purpose or could establish a link in the chain of evidence to be used for that purpose.

103.    What is clear, is that the RFI violates Mr. McKamey's constitutional rights to be free of compelled testimony and sworn production that could possibly lead to a criminal prosecution.

104.    Defendant Lawrence and TDCI policymakers directly violated Mr. McKamey's Fourth Amendment and First Amendment rights by stating warrantless searches of Mr. McKamey's property "will occur" and also retaliated to Mr. McKamey invoking his right to be free of warrantless searches and his right not to be compelled to speak.

105.    These violations have caused Mr. McKamey to incur substantial expenses in legal fees and other costs to defend himself from this RFI and defend the invasion of his rights by Defendant Lawrence.

## V.    CLAIMS FOR RELIEF

### COUNT ONE:  42 U.S.C. § 1983

### (Violation of Fifth Amendment to the United States Constitution)

### (Against Defendant Skrmetti in his official capacity)

106.    Paragraphs 1 through 105 are incorporated by reference as if fully restated herein.

107.    Under the Fifth Amendment to the United States Constitution, no person shall be compelled in any proceeding – whether civil, criminal, administrative, judicial, investigatory, or adjudicatory – to provide testimony that could possibly lead to criminal prosecution or furnish a link in the chain of evidence that could lead to prosecution.

108.    This articulation of the Fifth Amendment provides a clearly established right under the United States Constitution.

22

109. Defendant Skrmetti's RFI demands sworn testimony and verified responses and production of documents regarding information that is directly punishable as a criminal offense under Tenn. Code Ann. § 47-18-104(a) because the RFI states Defendant Skrmetti "has reason to believe" Mr. McKamey has violated the Tennessee Consumer Protection Act.

110. Defendant Skrmetti's RFI demands sworn testimony and verified responses and production of documents regarding information that could be used to pursue prosecution of Mr. McKamey for numerous serious offenses discussed in the Documentary – and appears to be intended for such use – included, but not limited to, especially aggravated kidnapping, rape, and aggravated assault.

111. All information sought by the RFI will directly or indirectly elicit information from Mr. McKamey that could be used to prosecute him for Tennessee Consumer Protection Act violations or any of the serious criminal offenses discussed in the Documentary.

112. Therefore, the Fifth Amendment privilege affords Mr. McKamey the right not to participate in or respond to the RFI.

113. Even though Mr. McKamey expressly invoked his Fifth Amendment privilege to Defendant Skrmetti's office on January 5, 2024, Defendant Skrmetti persists in his invasion of Mr. McKamey's Fifth Amendment rights and demands that Mr. McKamey appear in person for sworn testimony in response to the RFI on April 8, 2024.

114. Therefore, Defendant Skrmetti is liable for his violation of Mr. McKamey's constitutional rights under the Fifth Amendment to the United States Constitution under these circumstances.

23

## COUNT TWO:  42 U.S.C. § 1983

## (Violation of Fifth Amendment to the United States Constitution)

## (Facial Challenge to T.C.A. § 47-18-106)

115.    Paragraphs 1 through 114 are incorporated by reference as if fully restated herein.

116.    The RFI expressly relies upon T.C.A. § 47-18-106.

117.    T.C.A. § 47-18-106(a) provides that "whenever the attorney general has reason to believe that a person is engaging in, has engaged in, or, based upon information received from another law enforcement agency, is about to engage in any unlawful act or practice under this part, or has reason to believe it to be in the public interest to conduct an investigation to ascertain whether any person is engaged in, has engaged in, or is about to engage in such act or practice, the attorney general may: (1) require the person to file a statement or report in writing, under oath or otherwise, as to all the facts and circumstances concerning the alleged violation and to furnish and make available for examination all documentary material and information relevant to the subject matter of the investigation; (2) examine under oath any person connected to the alleged violation; and (3) examine any merchandise or any sample of merchandise deemed relevant to the subject matter of the investigation.

118.    T.C.A. § 47-18-106(c) provides that the attorney general can seek to compel compliance for untimely with the RFI.

119.    T.C.A. § 47-18-104(a) makes any "unfair or deceptive act or practice" in violation of the Tennessee Consumer Protection Act a "Class B misdemeanor."

120.    The Fifth Amendment to the United States Constitution guarantees individuals the right to be free of compelled self-incrimination in any proceeding, including investigations

24

seeking information which either directly leads to prosecution or furnishes a link in the chain of evidence that could lead to criminal prosecution.

121.    On its face, an RFI is only authorized by T.C.A. § 47-18-106(a) in situations where the attorney general has "reason to believe" that a person has committed a Class B misdemeanor or has "reason to believe" that the public interest requires an investigation to ascertain whether a person has committed a Class B Misdemeanor.

122.    Because the very circumstance giving rise to an RFI under the statute also triggers the Fifth Amendment, the two can never be in harmony.

123.    Accordingly, because there is no set of circumstances under which the statute authorizing an RFI would not violate the Fifth Amendment, the statute is facially invalid and should be declared unconstitutional.

## COUNT THREE:  42 U.S.C. § 1983

### (Violation of Fourth Amendment to the United States Constitution)

### (Against Defendant Lawrence in his official capacity)

124.    Paragraphs 1 through 123 are incorporated by reference as if fully restated herein.

125.    The Fourth Amendment to the United States Constitution guarantees individuals the right to be free from warrantless searches and seizures with certain exceptions not applicable in this case.

126.    The Fourth Amendment is a clearly established right under the United States Constitution.

127.    Mr. McKamey maintains a reasonable expectation of privacy on his property.

128.    Mr. McKamey's personal, private property cannot be characterized as any closely regulated industry.

25

129. Defendant Lawrence's office stating that warrantless "continued inspections will occur" is an invasion of Mr. McKamey's rights under the Fourth Amendment complete upon its utterance.

130. Defendant Lawrence cannot claim ignorance of the warrant requirement because the same chapter and part cited by Defendant Lawrence's office for its authority to inspect Mr. McKamey's property includes T.C.A. § 68-120-117 which governs the inspection procedure and outlines the process for inspectors "in the event that a building official is denied permission to make an inspection and a warrant is required by the Constitution of the United States."

131. Under these circumstances, Defendant Lawrence's conduct meets no reasonable legislative or administrative standard necessary to permit warrantless, continuous searches of Mr. McKamey's property.

132. No reasonable, legislative or administrative standard would permit "continued" searches of a property until a person submits an affidavit desired by law enforcement but not required by any law.

133. Defendant Lawrence's "continued inspections" are designed to intimidate Mr. McKamey into unnecessary compliance.

134. Therefore, Defendant Lawrence is liable for his invasion and violation of Mr. McKamey's constitutional rights under the Fourth Amendment.

## COUNT FOUR: 42 U.S.C. § 1983

### (Retaliation for exercising Fourth Amendment to the United States Constitution)

### (Against Defendant Lawrence in his official capacity)

135. Paragraphs 1 through 134 are incorporated by reference as if fully restated herein.

136.    The Fourth Amendment right to be free from warrantless searches is a clearly established right under the United States Constitution.

137.    The actions by Defendant Lawrence in Count Three came in direct response to Mr. McKamey citing T.C.A. § 68-120-117 thereby invoking his Fourth Amendment right to be free of warrantless searches.

138.    But for Mr. McKamey's exercising his Fourth Amendment rights, Defendant Lawrence's office would not have stated "continued inspections will occur" until Mr. McKamey complied with the demand for him to submit a sworn affidavit which was not required by any law in Tennessee.

139.    Therefore, Defendant Lawrence is liable to Mr. McKamey for retaliation against protected conduct.

### COUNT FIVE:  42 U.S.C. § 1983

**(Retaliation for exercising First Amendment to the United States Constitution)**

**(Against Defendant Lawrence in his official capacity)**

140.    Paragraphs 1 through 139 are incorporated by reference as if fully restated herein.

141.    Freedom of speech is guaranteed to all citizens, including Mr. McKamey, under the First Amendment to the United States Constitution.

142.    The right not to speak is a corollary of the freedom of speech.

143.    The difference between compelled speech and compelled silence is without constitutional significance.

144.    Defendant Lawrence, through TDCI policymakers, repeatedly demanded that Mr. McKamey complete and submit a sworn affidavit attesting to the fact that four building code violations were discovered on his property.

27

145.     No law requires this affidavit.

146.     By refusing to complete and submit the affidavit, Mr. McKamey exercised his right under the First Amendment to not speak.

147.     In direct response to Mr. McKamey exercising this privilege, Defendant Lawrence's office stated that warrantless "continued inspections will occur" until he complied.

148.     But for Mr. McKamey exercising his First Amendment rights, Defendant Lawrence's office would not have stated "continued inspections will occur" until Mr. McKamey complied with the demand for him to submit a sworn affidavit which was not required by any law in Tennessee.

149.     Therefore, Defendant Lawrence is liable to Mr. McKamey for retaliation against protected conduct.

## COUNT SIX:  28 U.S.C. § 2201 and FRCP 57

### (Declaratory Judgment)

### (Against Defendant Skrmetti in his official capacity)

150.     Paragraphs 1 through 149 are incorporated by reference as if fully restated herein.

151.     This court is empowered under federal law to declare rights of any interested party regardless of whether further relief is sought.

152.     The Fifth Amendment may be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.  The test for the valid invocation of the Fifth Amendment is whether Mr. McKamey has reasonable cause to apprehend danger from a direct answer.  The scope of the privilege protects the witness from compelled disclosure not merely of evidence which may lead to criminal prosecution but also of information which would

28

furnish a link in the chain of evidence that could lead to prosecution as well as evidence which an individual reasonably believes could be used against him in criminal prosecution.

153.    Defendant Skrmetti's office made clear that the RFI arose from the Documentary.

154.    The RFI expressly alleges that Mr. McKamey has violated the Tennessee Consumer Protection Act, which is a Class B misdemeanor with a maximum sentence of six months in jail for each violation.

155.    The Documentary accuses Mr. McKamey of far more serious offenses including multiple Class A felonies.  Part of the legal basis for this accusation was expressly quoted by Defendant Skrmetti in the RFI, which seeks information beyond the scope of any consumer transaction.

156.    Therefore,  Mr. McKamey is entitled to invoke his Fifth Amendment privilege in response to every question and demanded action by the RFI.

157.    Mr. McKamey respectfully requests this Honorable Court enter a declaration with the effect of a final judgment that he is entitled under the Fifth Amendment to not participate in the RFI in any manner with no penalty as a result.

### COUNT SEVEN:  28 U.S.C. § 2201 and FRCP 57

### (Declaratory Judgment)

### (Against Defendant Lawrence in his official capacity)

158.    Paragraphs 1 through 157 are incorporated by reference as if fully restated herein.

159.    The Fourth Amendment right to be free from warrantless searches is a clearly established right under the United States Constitution.

29

160. Defendant Lawrence, through TDCI policymakers, stated that "continued inspections will occur" on Mr. McKameys property in response to Mr. McKamey referencing the statutory warrant requirement under Tennessee law.

161. As the State Fire Marshal with the power to determine violation of building code with criminal misdemeanor liability, Defendant Lawrence is unquestionably a state law enforcement actor.

162. Therefore, Mr. McKamey is entitled under the Fourth Amendment to be presented a warrant supported by probable cause from Defendant Lawrence prior to any entry onto Mr. McKamey's property.

163. Mr. McKamey respectfully requests this Honorable Court enter a declaration with the effect of a final judgment that he is entitled under the Fourth Amendment to be presented a warrant supported by probable cause prior to any entry onto his property by Defendant Lawrence or his agents.

## COUNT EIGHT:  28 U.S.C. § 2201 and FRCP 57

### (Declaratory Judgment)

### (Against Defendant Lawrence in his official capacity)

164. Paragraphs 1 through 163 are incorporated by reference as if fully restated herein.

165. Freedom of speech is guaranteed to all citizens, including Mr. McKamey, under the First Amendment to the United States Constitution.

166. The right not to speak is a corollary of the freedom of speech.

167. The difference between compelled speech and compelled silence is without constitutional significance.

168. Defendant Lawrence, through TDCI policymakers, repeatedly demanded that Mr. McKamey complete and submit a sworn affidavit attesting to the fact that four building code violations were discovered on his property.

169. No law requires this affidavit.

170. By refusing to complete and submit the affidavit, Mr. McKamey exercised his right under the First Amendment to not speak.

171. Mr. McKamey respectfully requests this Honorable Court enter a declaration with the effect of a final judgment that he is entitled under the First Amendment to not complete any sworn affidavit demanded by Defendant Lawrence but not otherwise required by law such that retaliation in response to such exercise by Mr. McKamey is prohibited.

## VI. PRAYER FOR RELIEF

WHEREFORE, all foregoing premises considered, Mr. McKamey respectfully requests this Honorable Court grant him the following relief:

1. Exercise jurisdiction over these Parties;

2. Exercise jurisdiction over the subject matter herein;

3. Find Defendants liable to Mr. McKamey as to all Claims for Relief;

4. Issue a preliminary injunction restraining Defendant Skrmetti and his agents from forcing Mr. McKamey to comply with the RFI;

5. Issue a preliminary injunction restraining Defendant Skrmetti and his agents from forcing Mr. McKamey to comply with the RFI;

6. Issue a preliminary injunction against Defendant Lawrence and his agents from entering Mr. McKamey's property;

31

7. Preliminary injunction against Defendant Lawrence and his agents from entering Mr. McKamey's property;

8. Enter a declaratory judgment that Mr. McKamey is entitled under the Fifth Amendment to not participate in any way in the RFI with no penalty to occur as a result;

9. Enter a declaratory judgment that entry onto Mr. McKamey is entitled under the Fourth Amendment to be presented with a probable-cause-supported warrant by Defendant Lawrence or his agents before they may enter Mr. McKamey's property;

10. Enter a declaratory judgment that Mr. McKamey is entitled under the First Amendment to not submit any affidavit to Defendant Lawrence which is not otherwise required by law;

11. Award Mr. McKamey his costs, including reasonable attorney's fees under 42 U.S.C. § 1988; and

12. Any other relief the Court finds appropriate.


Respectfully submitted,

/s/ Davis F. Griffin
Davis Fordham Griffin, Esq.
TBPR #34555
NORTHSTAR LITIGATION, P.C.
209 10th Avenue South, Suite 560
Nashville, TN 37203
davis@northstarpc.com

*Counsel for Plaintiff*


Submitted March 29, 2024.