# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RUSS McKAMEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00363** |
| | ) | **Judge Aleta A. Trauger** |
| **JONATHAN SKRMETTI, Tennessee** | ) | |
| **Attorney General and Reporter in his** | ) | |
| **official capacity; and** | ) | |
| **CARTER LAWRENCE, Commissioner** | ) | |
| **of the Tennessee Department of** | ) | |
| **Commerce and Insurance and State Fire** | ) | |
| **Marshal, in his official capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM

Before the court is the Motion to Dismiss (Doc. No. 23) filed by defendants Jonathan Skrmetti, Tennessee Attorney General and Reporter ("AG"), and Carter Lawrence, Commissioner of the Tennessee Department of Commerce and Insurance ("TDCI") and State Fire Marshal, both sued in their official capacity only. Plaintiff Russ McKamey has filed a Response in opposition to the motion (Doc. No. 26), and the defendants filed a Reply (Doc. No. 27).

For the reasons set forth herein, the motion will be granted, and this case will be dismissed.

## I.    LEGAL STANDARD – RULE 12(B)(6)

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a

claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (2007). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

## II.    THE AMENDED COMPLAINT

The plaintiff filed this lawsuit, followed shortly by an Emergency Motion for Preliminary Injunction, on March 29, 2024. (Doc. Nos. 1, 8.) The defendants responded to that motion and

filed a Motion to Dismiss the original Complaint, which prompted the plaintiff to file the Amended Complaint (Doc. No. 18) on May 2, 2024, along with an Amended Emergency Motion for Preliminary Injunction (Doc. No. 19), which is now also pending.

The Amended Complaint ("Complaint" or "Compl.") alleges that McKamey resides in in Summertown, Lawrence County, Tennessee and operates McKamey Manor, "an immersive theater experience in the genre of horror," on his property in Summertown. (Compl. ¶¶ 1, 19.) McKamey has been subject to prior investigations related to the operation of McKamey Manor (*see id.* ¶¶ 2–6) that do not appear to be immediately relevant here. However, in 2023, the AG launched an investigation into McKamey Manor, immediately following, and prompted by, the distribution of a documentary ("Documentary"), produced by Hulu, about McKamey Manor entitled "Monster Inside: America's Most Extreme Haunted House," which premiered on October 12, 2023. (*Id.* ¶¶ 7–8.) McKamey maintains that

> [t]he Documentary – from which Defendant Skrmetti's investigation was admitted to have been born and on which it relies – is explicitly and emphatically making the case that Mr. McKamey could and should be criminally charged with a range of felonious conduct including, but not limited to, especially aggravated kidnapping (A Felony), aggravated assault (C Felony), aggravated rape (A Felony) among a number of other conceivable offenses not excluding versions of attempted homicide."

(Compl. ¶ 66.)[1]

---

[1] The Complaint contains a substantial amount of detail about the Documentary, which was not authorized by the plaintiff and which the plaintiff clearly believes to be one-sided and unfair. According to McKamey, allegations in the documentary about a waiver form signed by participants in the haunted house experience are a large part of what prompted the AG's investigation. (*See* Compl. ¶¶ 33–66.) McKamey is also pursuing a separate federal lawsuit against the producers and creators of the Documentary, including Hulu, and an individual who allegedly illegally hacked into McKamey's email account to obtain information about McKamey that he then provided to the creators of the Documentary. *See* Complaint, *McKamey v. Hulu*, No. 1:24-cv-00037 (M.D. Tenn. April 8, 2024).

### A. The RFI and the AG Investigation

On October 31, 2023, McKamey received a letter from the AG's office, referencing the documentary and expressing concern, based on allegations in the documentary, about McKamey Manor's practices. (Compl. ¶ 26; *see also* Oct. 31, 2023 Letter, Doc. No. 18-2.) The letter provides notice that the AG's office would shortly be sending a formal request for documents and information about McKamey Manor's business practices.

On November 15, 2023, the AG's office issued a formal Request for Information ("RFI") to McKamey. (Compl. ¶¶ 9, 27; *see also* Doc. No. 18-3, RFI 1.) The RFI states that it is "[i]ssued [p]ursuant to Tenn. Code Ann. § 47-18-106" in connection with the investigation of McKamey Manor. (RFI 1.) Section 47-18-106 is a provision of the Tennessee Consumer Protection Act ("TCPA"). It broadly authorizes the AG to institute an investigation whenever the AG "has reason to believe that a person is engaging in, has engaged in, or . . . is about to engage in any unlawful act or practice under this part, or has reason to believe it to be in the public interest to conduct [such] an investigation." Tenn. Code Ann. § 47-18-106(a). As the plaintiff points out, "unfair or deceptive acts or practice affecting the conduct of any trade or commerce," as defined in the TCPA, are Class B misdemeanors. *Id.* § 47-18-104(a).

The RFI issued by the AG in this case is addressed to McKamey and informs him that he is "required, pursuant to Tenn. Code Ann. § 47-18-106(a)(1), to respond in writing to the attached Requests for Production of Documents and Information and provide a Written Statement Under Oath." (RFI 1.) It also states that McKamey is required to produce one or more witnesses who are knowledgeable about McKamey Manor's practices to appear and provide testimony under oath on a date certain or such other date as agreed upon in advance. (*Id.*) The RFI instructs the recipient to read Tenn. Code Ann. § 47-18-106 "carefully" and provides notice that "petitions filed pursuant to Tenn. Code Ann. § 47-18-106(b)" must be filed within ten days of receipt of the RFI. A copy

of the statute is attached to the RFI. The RFI incorporates two pages of definitions, two pages of instructions, nineteen individual requests for the production of documents or information, twenty-eight interrogatories to be answered under oath, and a form Affidavit of Compliance to be completed under oath by the person responsible for preparing and assembling the responsive documents and information.

The interrogatories ask for the following information under oath:

1. Identify the person(s) answering or assisting in answering this Request on your behalf.

2. When did you begin operating McKamey Manor in Tennessee?

3. When did you move McKamey Manor to Tennessee?

4. Identify in list form every person who has either worked for or volunteered at McKamey Manor since you began operating McKamey Manor in Tennessee. Include job titles, if applicable. Indicate which people were paid for their work versus those who were volunteers.

5. Describe your selection and screening process for allowing people to work or volunteer at McKamey Manor.

6. How many people are on McKamey Manor's waitlist to participate in a Tour?

7. What is the average length of time a Tour lasts?

8. Identify everyone who is present during a typical Tour.

9. What are the most common activities that occur on a Tour?

10. Describe how you decide what will occur on each Participant's Tour.

11. Identify all persons responsible for directing or controlling McKamey Manor's policies and procedures, including the procedures of the Tour.

12. Describe the selection process to participate in a Tour. Identify all persons who have, or had, the authority to select Participants. What criteria do you or your Agents use to decide who is chosen to Participate in a Tour? What screening process, if any, is done before a Participate [sic] starts a Tour? Are there any factors that immediately disqualify a potential Participant? If so, identify them in list form.

13. Has McKamey Manor ever charged money for a Participant to do a Tour, whether characterized as a donation, deposit, or otherwise? If so, provide details on

which Participants were required to pay and how much they were required to pay. What, if any, supplies are Participants required to purchase and bring for the Tour? Are Participants required to give you any goods in exchange for the opportunity to participate? If so, identify the goods.

14. Identify every disclosure you make to a Participant at any time before they begin a Tour, specifying what information is disclosed and at what point before a Tour begins.

15. When are Participants first given a waiver concerning participation in a Tour? Can Participants access the waiver before the day of the event?

16. When are Participants first given a non-disclosure agreement concerning McKamey Manor? Can Participants access the non-disclosure agreement before the day of the Tour?

17. What are the terms and conditions of receiving the $20,000 prize, or any previously offered monetary prize, for completing the Tour?

18. Do You currently have the funds to pay out if a person were to win? If so, describe how those funds are currently held (*e.g.*, cash, bank account, securities, other form of value).

19. Has a Participant ever won the prize?

20. Is it possible for a Participant to win the prize?

21. Identify in list form every person, along with their contact information, who has attempted to win the prize since you began operating McKamey Manor in Tennessee. How did each of those Tours end?

22. Identify any and all procedures you and/or Agents of McKamey Manor have to monitor the health and safety of Participants while they are participating in a Tour.

23. Has McKamey Manor ever facilitated medical treatment for a Participant?

24. To your knowledge have any Participants sought medical treatment soon after participating in a Tour? If so, identify in list form the name(s) of the Participant(s) and the injuries, if known.

25. Identify in list form all props and supplies you have used during a Tour.

26. Are all Tours filmed? Identify every Tour that was filmed since you began operating McKamey Manor in Tennessee. For each such Tour, if you no longer have possession, custody, or control of such film, explain why and include any information you have about the film's current custodian and location.

27. Explain how McKamey Manor is funded, identifying each funding source and the amount of funds from that source that has been spent in the operation of McKamey Manor.

28. List your total gross income by year since 2017. Identify how much of your income came from the operation of McKamey Manor.

(RFI 9–13.)

The RFI requests, among other categories of documents, copies of all versions of the waiver McKamey has had participants sign, all versions of any non-disclosure agreement he has had participants sign, a list of names and contact information for all former and scheduled participants, any documents provided to participants, and all policies and procedures relating to how McKamey Manor agents select participants, interact with participants, and conduct tours at McKamey Manor. (RFI 7.)

A copy of Tenn. Code Ann. § 47-18-106 is attached to the RFI. (Doc. No. 18-3, at 17.) In addition to authorizing the AG to issue RFIs, this provision governs the procedure for doing so and also sets forth protections for the rights of any person on whom such an RFI is served. In particular, the person may, within ten days of receipt of an RFI, petition the Davidson County chancery or circuit court for a protective order "to modify or set aside" the RFI. Tenn. Code Ann. § 47-18-106(b). Alternatively, if no protective order is issued, the AG may apply to any court of competent jurisdiction for an order compelling compliance with the RFI. *Id.* § 47-18-106(c). The statute also states that "the powers conferred upon the attorney general and reporter by this part must not be used for the purpose of compelling any natural person to furnish testimony or evidence which may be protected by such person's right against self-incrimination." *Id.* § 47-18-106(g)(2).[2]

---

[2] The Complaint states that McKamey Manor "does not operate and has never operated under or as an entity in the State of Tennessee," such that "[a]ll information sought in the RFI is personal information belonging to Mr. McKamey." (Compl. ¶ 22.) This distinction is important,

McKamey, through counsel, filed a Petition for Protective Order in the Chancery Court for Davidson County, Tennessee ("Petition"), seeking an extension of the deadline for responding to the RFI and for producing a witness knowledgeable of McKamey Manor's practices. (Doc. No. 24-1.) The Petition did not object to the RFI on the grounds of the Fifth Amendment or any other basis. The AG did not respond to the Petition, and McKamey nonsuited it the same day he filed this lawsuit. (*See* Doc. No. 24-2.)

On January 5, 2024, before filing this lawsuit, McKamey, through counsel, "expressly invoked his Fifth Amendment privilege not to participate in or respond to the RFI." (Compl. ¶ 83; *see also* Doc. No. 18-1, McKamey Aff. ¶ 10.) The letter or communication in which this right was invoked was not included among the exhibits filed with the Complaint. According to McKamey, he proposed, through counsel, that he provide information to the AG's office "outside the RFI process—thereby satisfying the purported goal of the investigation without waiving Mr. McKamey's privilege or exposing him unnecessarily to potential criminal liability." (Compl. ¶ 85.) The AG's office declined this proposal on the basis that the responses would not be authenticated or admissible in a court proceeding, thus, according to McKamey, establishing that the requested information is "being gathered for the purpose of exhibition in a legal action." (Compl. ¶ 87.) In subsequent communications, the AG's office notified McKamey that it would expect his responses and appearance by the dates requested in his Petition to extend the deadlines—February 15, 2024 for responding to the RFI and April 8 to provide a witness to appear and testify under oath—and, failing a timely response, would pursue enforcement of the RFI. (Compl. ¶¶ 90–91.)

---

because "corporations and other collective entities" do not have a Fifth Amendment right against self-incrimination. *Braswell v. United States*, 487 U.S. 99, 104, 105 (1988).

The plaintiff alleges that the provision of information, documents, and testimony under oath is not necessary to the AG's investigation but only serves the purpose of "lay[ing] a perjury trap for Mr. McKamey" and discovering information "which could lead to a criminal prosecution." (Compl. ¶ 92.) According to McKamey, the AG's office has already reached an opinion, based on the Documentary, that some elements of McKamey Manor's business practices are illegal, such that any statements by him regarding his business practices could expose him to criminal liability. (*See generally* Compl. ¶¶ 94–105.) He asserts that the RFI, *per se*, "violates Mr. McKamey's constitutional rights to be free of compelled testimony and sworn production that could possibly lead to a criminal prosecution." (Compl. ¶ 106.)

**B.     The TDCI/Fire Marshal Investigation**

On November 21, 2023, the same day McKamey received the RFI, the TDCI received an "anonymous complaint" about McKamey Manor. (Compl. ¶ 11.) The anonymous complaint alleged that the barn on McKamey's property was being "used as a special amusement facility" and that the location had blocked or obstructed exits. (Compl. ¶ 68; Doc. No. 18-4.) According to McKamey, this allegation shows that "whoever filed the Complaint had to know about a previous Complaint filed on November 18, 2019." (Compl. ¶ 68.) The prior complaint was resolved by McKamey's agreement to remove all "props" from the barn and to no longer use the barn for "McKamey Manor shows." (*Id.*; *see also* Doc. No. 18-5, at 5 ("Mr. McKamey . . . understands and states he will not use the barn for any other purpose other than storage. As of this date December 18, 2019 this complaint will now be closed.").)

Defendant Lawrence's office conducted an inspection of McKamey's property the same day, on November 21, 2023, which resulted in the issuance of a Complaint Inspection Report. (Compl. ¶¶ 67, 69; *see* Doc. No. 18-6, at 1.) The Inspection Report found that the barn and

"adjacent CONEX box[3] meet the definition of a special amusement building," and it documents

four "deficiencies" or code violations: (1) "A[n] automatic fire detection system has not been

installed in the barn and CONNEX in accordance with Section 907 of the IBC"; (2) "Exit signs

have not been installed at required exists in the bar and CONNEX box"; (3) "Emergency

voice/alarm communications system has not been provided in the barn or CONNEX [sic] box; and

(4) "A portable fire extinguisher has not been provided." (Compl. ¶ 69; *see* Doc. No. 18-6, at 3–

4.) According to McKamey, each of these deficiencies constitutes a Class C misdemeanor under

Tenn. Code Ann. § 68-102-113(g). (Compl. ¶ 70.) He does not allege that he has been charged

with any such misdemeanor.

The Inspection Report states that McKamey had seven days from the date of the inspection

to provide a Plan of Corrective Action ("POCA") to correct the identified deficiencies. (Doc. No.

18-6, at 4.) It also reflects that McKamey had "stated he was willing to provide a letter

documenting that he will cease to use any of the property for special amusement purposes and

participants will not be allowed to enter the structures." (*Id.*) The POCA attached to the Inspection

Report and electronically signed by McKamey on December 1, 2023 states, "We will not use barn

for anything besides personal storage." (*Id.* at 5.)

Following McKamey's submission of the POCA, Chris Bainbridge, as Director of the

Codes Enforcement Section of the Fire Prevention Division of the TDIC, responded by email and

an attached letter. He confirmed that his office had received McKamey's proposed POCA, "stating

that the barn at McKamey Manor will not be used for anything besides personal property," and

asked McKamey to "complete an affidavit to that effect" and return it to his office. (Doc. No. 24-

---

[3] A Conex (or Connex) (short for "Container for Export") box is a large metal shipping
container. *See, e.g.*, https://containerone.net/blogs/news/conex-box-or-shipping-container-what-s-
the-difference.

5, at 3.) Bainbridge attached a draft affidavit for McKamey to use but also gave him the option of editing it or drafting his own. Bainbridge's email states that, once his office received a notarized affidavit, it would approve McKamey's POCA. (*Id.*) The proposed affidavit states, in relevant part:

5. On November 21, 2023, the State Fire Marshal's Office conducted an inspection at McKamey Manor after receiving a complaint.

6. At the time of the inspection, the State Fire Marshal's Office observed the following fire and building deficiencies:

a. Lack of automatic fire detection systems in the barn and Conex boxes in violation of 2012 IBC 411.3, 2012 IBC 411.5, IFC 907.2.12, and IFC 907.2.12.1;

b. Exit signs have not been installed as required in the barn and in the Conex boxes in violation of 2012 IBC 411.7 and Section 907.2.12.2;

c. Lack of emergency voice/alarm communication system in the barn and Conex boxes in violation of 2012 IBC 411.6; and

d. A portable fire extinguisher has not been provided in violation of 2012 IFC 906.1.

9. [sic] On December 1, 2023, I submitted a Plan of Corrective Action to the State Fire Marshal's Office stating I will not use the barn for anything besides personal storage.

10. I declare under penalty of perjury that the foregoing is true and correct.

(Doc. No. 24-5, at 4–5.)[4]

McKamey never signed this proposed affidavit; nor did he draft and submit his own affidavit to support his proposed POCA. McKamey's counsel apparently objected to the request that he submit an affidavit in support of his POCA. McKamey contends that, in a telephone call

---

[4] McKamey attached as an exhibit to the Complaint just Bainbridge's email, without the attachments. (Doc. No. 18-7.) The defendants filed with the Motion to Dismiss a copy of the email along with the attachments, including Bainbridge's letter and the proposed affidavit. The court finds that it may consider these documents, because they were "referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted).

between his counsel and counsel for the Fire Prevention Division on January 8, 2024, in which his attorney apparently asked on what authority the Fire Prevent Division requested the affidavit, "Associate Counsel for Fire Prevention stated she did not know the authority for requiring the submission of an affidavit but would research and confirm." (Compl. ¶ 72.) On January 26, 2024, the same attorney sent another communication, explaining the Fire Prevention Division's position. (*See* Doc. No. 24-6.) That letter is not in the record.[5] According to the January 30, 2024 email response from McKamey's counsel, the Fire Prevention Division had followed up on January 9 and again on January 22, 2024, "stating that [the Fire Prevention Division] was 'requesting' the affidavit." (Doc. No. 24-6, at 4.) McKamey's counsel notified the Fire Prevention Division attorney that, "[s]ince it does not appear to be a requirement, we are not going to submit an affidavit at this time." (*Id.*)

Referring to the January 26, 2024 letter, counsel for McKamey stated: "In your January 26 letter, you stated that if my client did not submit the affidavit, your client/office would 'continue to monitor the property.' Please elaborate on what you mean by that including authority for such surveillance in the absence of a new complaint." (*Id.*) The Fire Prevention Division attorney responded by email on January 30, 2023 that the "Department's authority in this matter is in Tennessee Code Annotated Title 68, Chapter 120, and all rules promulgated thereunder." (Doc. No. 24-6, at 2.) According to McKamey, "[n]o provision of Chapter 120 of Title 68 or other rule requires the submission of an affidavit after an inspection." (Compl. ¶ 74.)

Counsel for McKamey responded again, stating his and his client's position that nothing in the Tennessee Code or regulations authorized the Fire Prevention Division to "require" an

---

[5] Again, the Complaint refers to an entire chain of emails but only one, dated February 2, 2024, is attached to the Complaint. The defendants have filed as an exhibit the entire email thread but omitted the January 26, 2024 letter.

affidavit. (Doc. No. 24-6, at 2.) He reiterated his question regarding the department's authority: "[G]iven the absence of authority to require an affidavit, what authority does your office have to 'monitor' my client's property in absence of a complaint and in response to his refusal to submit this affidavit, which, again, is not required?" (*Id.*) In his view, "no such authority exists." (*Id.*) He referred the Fire Prevention Division attorney to Tenn. Code Ann. § 68-120-117 and stated: "*Ultra vires* surveillance by your client/office will not be tolerated." (*Id.*)

Counsel for the State Fire Marshal's Office ("SFMO") responded to this communication on February 2, 2024. (Compl. ¶ 75; Doc. No. 18-8.) This email states, in relevant part:

> As you have previously acknowledged, the SFMO has authority over this matter. As you are aware, Mr. McKamey's property was initially inspected in 2019 in response to a complaint received by the SFMO. Mr. McKamey was requested to provide a [POCA]. Additional inspections occurred until an acceptable POCA was received by the SFMO. Part of Mr. McKamey's POCA, which was approved by the SFMO, required that props at the barn be removed and no future shows take place within the structure. Additionally, Mr. McKamey expressed his understanding that the barn could not, and would not, be used for any purpose beyond storage. As a result, the complaint was closed.
>
> As you are aware, on November 21, 2023, the SFMO again conducted an inspection at the property in response to a complaint received by the SFMO. Upon inspection, it was discovered that Mr. McKamey was utilizing the barn as a special amusement facility, in conflict with state law and Mr. McKamey's previously submitted POCA. As a result, Mr. McKamey was required to provide a POCA to address outstanding code deficiencies at the property, including the continued use of the barn.
>
> As you are aware, on or about December 1, 2023, Mr. McKamey submitted a POCA which stated "[w]ill not use the barn for anything besides personal storage." Because of Mr. McKamey's previous actions, wherein he violated a substantially similar POCA and utilized the barn for purposes beyond storage, this statement alone was not deemed sufficient and the POCA was rejected.
>
> Mr. McKamey is not required to bring the barn into compliance with adopted codes and standards so long as he does not use the facility for anything beyond storage. As you are aware, the SFMO suggested that Mr. McKamey complete an affidavit stating that the barn and CONEX boxes would only be used for storage. Such action would constitute an acceptable POCA and the complaint would be closed.
>
> Currently, the complaint against Mr. McKamey's property remains open. At the direction of Assistant Commissioner Gary Farley, continued inspections will occur

until an acceptable POCA is received, or the facility is brought into compliance
with adopted codes and standards and inspected by the SMFO.

(Doc. No. 18-8.)

Referencing the final sentence quoted above, the Complaint asserts that "[t]hese threatened inspections in violation of Mr. McKamey's right to be free of warrantless searches under the Fourth Amendment are in direct retaliation to Mr. McKamey asserting such right and to Mr. McKamey asserting his right against compelled speech." (Compl. ¶ 76.) McKamey claims that, but for his "exercising his First and Fourth Amendment rights," the SFMO's office "would not have stated that warrantless 'continued inspections will occur' until he complied with the demand." (Compl. ¶ 79.) He also asserts that the SFMO's involvement, arising from an anonymous complaint, "is indicative of coordination between the Defendants and an ulterior motive on the part of Defendant Lawrence for insisting on a sworn affidavit from Mr. McKamey." (Compl. ¶ 80.) McKamey also alleges that, because the affidavit is not required by any law, the "only reason" for it was "to construct a perjury trap for him," which would "create Class D felony exposure for Mr. McKamey." (Compl. ¶ 81 (citing Tenn. Code Ann. § 39-16-703).)

He alleges that Commissioner Lawrence, in his official capacity as Commissioner of the TDCI, "directly violated Mr. McKamey's Fourth Amendment rights and First Amendment rights by stating warrantless searches of Mr. McKamey's property 'will occur'" and retaliated against him for "invoking his right to be free of warrantless searches and his right not to be compelled to speak." (Compl. ¶ 107.)

## C. The Relief Sought

Based on these allegations, the Complaint sets forth claims under 42 U.S.C. § 1983, asserting that the AG's office's issuance and threatened enforcement of the RFI violates McKamey's Fifth Amendment rights (Count One); that Tenn. Code Ann. § 47-18-106 is facially

unconstitutional, as it violates the Fifth Amendment (Count Two); and that the TDCI Commissioner's office violated his Fourth Amendment rights by threatening "warrantless 'continued inspections'" to "intimidate [him] into unnecessary compliance" (Count Three). (Compl. ¶¶ 132, 136.) Counts Four and Five assert that the Commissioner threatened "warrantless 'continued inspections'" in retaliation for McKamey's invoking his rights under the Fourth Amendment and exercising his First Amendment right not to speak. (*See* Compl. ¶ 145 ("The right not to speak is a corollary of the freedom of speech.").) In Counts Six through Eight, McKamey seeks judicial declarations under 28 U.S.C. § 2201 to the effect that "Mr. McKamey is entitled to invoke his Fifth Amendment privilege in response to every question and demanded action by the RFI" and "entitled not to participate in the RFI in any manner with no penalty as a result" (Compl. ¶¶ 159, 160); that he is "entitled under the Fourth Amendment to be presented with a warrant supported by probable cause . . . prior to any entry onto [his] property" by agents of the TDCI; and that he is "entitled under the First Amendment to not complete any sworn affidavit demanded" by agents of the TDCI.

The defendants seek dismissal of all counts in the Amended Complaint. In response, the plaintiff concedes that Count Two (asserting that Tenn. Code Ann. § § 47-18-106 is facially unconstitutional) must be dismissed but otherwise opposes dismissal of any claim. In light of the plaintiff's concession, Count Two will be dismissed without discussion. The viability of the other claims is addressed below.

## III.     DISCUSSION

### A.     The Fifth Amendment Claims

#### 1.     Count One

The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S.

Const. amend. V. The Fifth Amendment privilege "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972).

In Count One of the Complaint, McKamey claims that the AG, in his official capacity, is "liable for his violation of Mr. McKamey's constitutional rights under the Fifth Amendment to the United States Constitution," based on McKamey's allegations that he expressly invoked his Fifth Amendment privilege not to respond to the RFI, but the AG "persists in his invasion of Mr. McKamey's Fifth Amendment rights and demands that Mr. McKamey appear in person for sworn testimony in response to the RFI." (Compl. ¶¶ 116, 117.)

In support of the Motion to Dismiss, the AG argues that the Fifth Amendment does not afford McKamey "blanket immunity" from "participating in a statutorily authorized investigation." (Doc. No. 24, at 15.) Rather, it protects him "from answering specific questions or requests that would incriminate him," but, because he has not identified particular RFI requests that implicate the Fifth Amendment, "his attempted blanket assertion of the Fifth Amendment is ineffective." (*Id.*) More to the point, for purposes of Count One, the AG also asserts that McKamey has failed to establish a Fifth Amendment violation, because, "[i]f McKamey wishes to assert his privilege against self-incrimination in his responses to the requests for information, he absolutely may," but he must do so on a "question-by-question basis." (*Id.* at 18 (citing Tenn. Code Ann. § 47-18-106(g); *In re Stallman*, 576 B.R. 563, 567 (Bankr. W.D. Mich. 2017)).)

In response, the plaintiff reproduces all twenty-eight of the questions to be answered under oath and the eighteen requests for production of documents or information, takes issue with the caselaw on which the AG relies as distinguishable on the facts, and maintains that, "[b]ecause all

information sought by the RFI is testimonial, compulsory, and incriminating, Mr. McKamey is absolutely privileged from responding under the Fifth Amendment.." (Doc. No. 26, at 16.) He points out that the RFI itself states, in the preface signed by the AG, that the "State has reason to believe that Russ McKamey and McKamey Manor are engaging in, have engaged in, or are about to engage in unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act of 1977 (TCPA), Tenn. Code Ann. § 47-18-101 *et seq.*, in connection with McKamey Manor's unfair and deceptive practices towards consumers." (*See id.* at 14 (quoting RFI, Doc. No. 18-3, at 2).) He asserts that the AG has stated that he will take steps to enforce compliance with the RFI, which amounts to "coercive pressure to speak," which itself "amount[s] to the sort of compulsive force that the Fifth Amendment forbids." (*Id.* at 16 (citation omitted).) McKamey maintains that he has "more than adequately pleaded his Fifth Amendment violation claim" under the circumstances presented here.

As an initial matter, as part of the court's continuing obligation to consider its jurisdiction over a case, the court observes that the doctrine of sovereign immunity protects states, as well as state officials sued in their official capacity for money damages, from suit in federal court. *Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005). There are three exceptions to sovereign immunity: (1) when the state has waived immunity by consenting to the suit; (2) when Congress has expressly abrogated the states' sovereign immunity, and (3) when the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908), applies. *Boler*, 865 F. 3d at 410. Insofar as Count One claims that the AG, in his official capacity, is liable to McKamey for a *past* violation of McKamey's constitutional rights, none of these exceptions appears to apply, and the AG is entitled to assert sovereign immunity as to this claim. The state of Tennessee has not waived immunity to civil rights claims, *see Berndt v. Tennessee*, 796 F.2d 879 (6th Cir. 1986);

Tenn. Code Ann. § 29-20-205; and, while the AG has not yet asserted sovereign immunity as a defense in this case, it does not appear at this early juncture that he has waived the defense, *see Brent v. Wayne Cty. Dep't of Hum. Servs.*, 901 F.3d 656, 682 (6th Cir. 2018) ("Although a state agency may waive its sovereign immunity and consent to suit by voluntarily appearing and defending against the merits of a case in federal court, we have not required an agency to make a full-throated assertion of its immunity in its initial dealings with the court to avoid waiver." (citing *Boler*, 865 F.3d 410–11)). Second, Congress did not abrogate the states' sovereign immunity to suits under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). And third, *Ex Parte Young*, as discussed below, permits claims for prospective injunctive and declaratory relief against state officials in their official capacity, but it does not authorize claims for damages (or declarations) relating to a past violation. *See S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 508 (6th Cir. 2008) ("The *Ex parte Young* exception does not, however, extend to any retroactive relief." (citation omitted)). Insofar as Count One asserts that the AG, in his official capacity, is "liable for his violation" of McKamey's Fifth Amendment rights, the plaintiff cannot recover money damages from the State, and the AG is entitled to sovereign immunity.

Aside from the fact that the plaintiff cannot seek damages for a past violation of his constitutional rights by a state official sued in his official capacity, the Complaint fails to state a claim for a past violation anyway. The plaintiff does not allege that he has actually been compelled to speak, that he has suffered any consequence arising from his failure to provide compelled testimony, that his compelled testimony has been used against him in a criminal proceeding, or even that he has been threatened with the use of compelled testimony. *See, e.g.*, *Haddad v. Gregg*, 910 F.3d 237, 252 (6th Cir. 2018): ("[M]ere coercion does not violate the . . . Self-Incrimination Clause [of the Fifth Amendment] absent use of the compelled statements in a criminal case. It is

only once compelled incriminating statements are used in a criminal proceeding . . . that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action." (quoting *McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005) (internal quotation marks and citations omitted)); *McKathan v. United States*, 969 F.3d 1213, 1217 (11th Cir. 2020) ("A 'classic penalty situation' arises when a person must choose between incriminating himself, on the one hand, or suffering government-threatened punishment for invoking his Fifth Amendment privilege to remain silent, on the other." (citing *Minnesota v. Murphy*, 465 U.S. 420, 435, (1984)).

Because the plaintiff is not entitled to sue a state official in his official capacity for money damages, and because the Complaint fails to allege any facts that establish a past violation of the plaintiff's Fifth Amendment privilege against self-incrimination, Count One of the Complaint is subject to dismissal. Insofar as Count One might be construed as asserting a claim for prospective relief, that claim is the subject of Count Six, addressed below.

2. *Count Six*

Count Six appears to fall within the scope of *Ex Parte Young*, insofar as it seeks a declaration of the plaintiff's rights in an attempt to avoid what he perceives as an imminent risk of a *future* violation of his constitutional rights. The *Ex Parte Young* exception to sovereign immunity applies when a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *see also Proctor v. Bd. of Med.*, 718 F. App'x 325, 328 (6th Cir. 2017) ("Under *Ex parte Young*, the Eleventh Amendment 'does not preclude relief against state officials in their official capacity for prospective injunctive or declaratory relief.'" (quoting *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993)). The question, then, is whether the Complaint plausibly alleges a claim for which McKamey is entitled to prospective injunctive relief in the form of a declaration under 28 U.S.C. § 2201.

The statute under which the RFI was issued provides a mechanism for responding, and if the person to whom an RFI is directed believes that any interrogatory or request implicates his privilege against self-incrimination, all he has to do is assert that privilege within the context of the administrative proceeding in which it arises, typically by filing a petition for a protective order. If the AG disagrees with that assertion, he may seek to compel responses, and the court to which that application is made can then make a determination whether the petitioner has validly invoked his Fifth Amendment right. *See* Tenn. Code Ann. § 47-18-106(c); *see also In re L. Sols. Chicago LLC*, 629 S.W.3d 124, 126–27 (Tenn. Ct. App. 2021) (describing applicable procedure). Aside from that procedure, all the person responding to an RFI has to do to assert the privilege is to actually *assert the privilege* in response to each of the interrogatories and requests and again when he appears personally. Under Tenn. Code Ann. § 47-18-106(g)(2), the AG does not have authority to compel a person to "furnish testimony or evidence" in violation of that person's Fifth Amendment privilege.

McKamey does not actually dispute the AG's authority to issue the RFI. Instead, the entirety of the controversy presented here appears to be over whether McKamey is entitled to make a "blanket assertion of Fifth Amendment immunity," as opposed to being required to make his assertion of the privilege on a question-by-question basis. (*See* Doc. No. 26, at 13 ("[T]his Court should . . . protect Mr. McKamey's 'blanket assertion of the privilege' with respect to potentially incriminating testimony." (citing *United States v. McAllister*, 693 F.3d 572 (6th Cir. 2012))).) McKamey seeks a declaration that he "is entitled to invoke his Fifth Amendment privilege in response to every question and demanded action by the RFI" and that he is "entitled under the Fifth Amendment to not participate in the RFI in any manner with no penalty as a result." (Compl. ¶¶ 159, 160.)

While this question arguably meets the threshold requirement of a "case or controversy" for purposes of establishing standing to bring a claim for a declaratory judgment under 28 U.S.C. § 2201, McKamey has not remotely explained how being required to respond to the RFI or to appear in person, *per se*, violates, or threatens to violate, his Fifth Amendment right not to incriminate himself. As set forth above, the statute under which the RFI was issued specifically authorizes such requests and also provides that "the powers conferred upon the attorney general and reporter by this part must not be used for the purpose of compelling any natural person to furnish testimony or evidence which may be protected by such person's right against self-incrimination." Tenn. Code Ann. § 47-18-106(g)(2). The Tennessee courts have expressly acknowledged that the "broad investigatory power" granted by § 47-18-106 is, "of course, subject to Constitutional limits." *In re Wall & Assocs.*, No. M2020-01687-COA-R3-CV, 2021 WL 5274809, at *3 (Tenn. Ct. App. Nov. 12, 2021).

Nothing in the Complaint suggests that the AG has in the past or intends in the future to exceed his statutory authority. While McKamey has arguably alleged facts showing that the Documentary contained very inflammatory allegations and that the AG issued the RFI because he already believes that McKamey is engaged in conduct that violates or has violated the TCPA, McKamey has not even attempted to show that *every* interrogatory and *every* request for information necessarily asks for incriminating and testimonial evidence, so as to implicate the Fifth Amendment. Moreover, McKamey alleges no facts indicating that the AG has refused or will refuse to recognize his assertion of the privilege. Instead, as alleged in the Complaint, the AG maintains that he has the statutory authority to issue an RFI and to compel McKamey to both respond to the RFI and to appear, even if McKamey intends to respond to every question and every request for documents and information by asserting his Fifth Amendment privilege. But being

required to assert the Fifth Amendment privilege on a question-by-question basis does not amount to a deprivation of the privilege.[6]

In addition, even if it will arguably be "fruitless" to require McKamey to answer or appear, because he will presumably assert the Fifth Amendment in response to every question, *see In re Stallman*, 576 B.R. 563, 567 (Bankr. W.D. Mich. 2017), the Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Cholewa v. United States*, 581 F. Supp. 3d 871, 887 (E.D. Mich. 2022) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)); *accord In re Stallman*, 576 B.R. at 567 ("Ms. Stallman cannot enjoy the advantages of asserting the Fifth Amendment privilege against self-incrimination without actually invoking the privilege and shouldering whatever burdens may result from doing so in this civil proceeding. If she intends to assert the constitutional privilege to avoid giving testimony, she may do so on a question-by-question basis."). In other words, in the civil context (unlike the criminal context), invoking the Fifth Amendment may have consequences, giving the AG a legitimate basis for requiring the assertion of privilege on the record, rather than merely informally and indirectly through the plaintiff's attorney.

McKamey's characterization of the RFI as a "perjury trap" does not further his claim. McKamey cannot "properly interpose a Fifth Amendment objection to the [AG's] discovery

---

[6] The "longstanding rule" in the Sixth Circuit is that a witness "must take the stand and answer individualized questions in order to invoke his Fifth Amendment privilege." *United States v. McAllister*, 693 F.3d 572, 583 (6th Cir. 2012) (quoting *United States v. Bates*, 552 F.3d 472, 475 (6th Cir. 2009); *see also In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983)). The Sixth Circuit has explained that there is a presumption against blanket assertions of the Fifth Amendment privilege, because the court in which the privilege is asserted "must determine if the witness has 'reasonable cause' to apprehend a real danger of incrimination," and blanket assertions are generally "not sufficient to meet this 'reasonable cause' requirement." *McAllister*, 693 F.3d at 583 (quoting *In re Morganroth*, 718 F.2d at 167).

effort" on the ground that the RFI is "designed to entrap him into committing perjury," because McKamey's "Fifth Amendment privilege does not 'protect[] him against false testimony that he later might decide to give.'" *States v. Conces*, 507 F.3d 1028, 1040 (6th Cir. 2007) (quoting *Apfelbaum*, 445 U.S. at 130).

For all of these reasons, the plaintiff is not entitled to a declaration "under the Fifth Amendment" to the effect that he "is entitled to invoke [a blanket] Fifth Amendment privilege in response to every question and demanded action by the RFI" or a declaration that he does not have to "participate in the RFI in any manner with no penalty as a result." (Compl. ¶ 160.) The plaintiff fails to state sufficient facts to entitle him to a declaration regarding his rights vis-à-vis the RFI. He has not established that he is imminently at risk of being compelled to provide testimony or information in violation of his Fifth Amendment rights, that he is being threatened with the loss of other rights unless he waives his Fifth Amendment rights, or that the state procedure under which the RFI was issued provides inadequate procedural safeguards. Count Six of the Complaint is subject to dismissal.

### B.  The Fourth and First Amendment Claims

#### 1.  *Count Three*

Count Three of the Complaint asserts that defendant Lawrence, in his official capacity as the Commissioner of TDCI, is liable for a violation of the plaintiff's Fourth Amendment rights. (Compl. ¶ 137.)

The Fourth Amendment, among other things, prohibits unreasonable searches. U.S. Const. amend IV. Searches "'without a warrant are presumptively unreasonable.'" *Bambach v. Moegle*, 92 F.4th 615, 628 (6th Cir. 2024) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). This rule "applies to commercial premises as well as to homes." *City of Los Angele v. Patel*, 576 U.S. 409, 419–20 (2015) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)). Thus, "warrantless

searches . . . by a state officer" of a home or business premises "violate the Fourth Amendment unless a recognized exception to the warrant requirement applies." *Bambach* 92 F.4th at 628 (citation omitted). "A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement." *Andrews v. Hickman Cty.*, 700 F.3d 845, 854 (6th Cir. 2012) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Another is the "administrative search exception." *Patel*, 576 U.S. at 420; *see also Benjamin as Tr. of Rebekah C. Benjamin Tr. v. Stemple*, 915 F.3d 1066, 1069 (6th Cir. 2019) ("[I]ncluded in this exception are administrative searches designed to assure compliance with building codes, including codes designed to prevent buildings from becoming dangerous to tenants or neighbors." (citing *Patel*, 574 U.S. at 420)). For an administrative search to fall within this exception, "the government must give the [property] owner 'an opportunity to obtain precompliance review before a neutral decisionmaker.'" *Id.* (quoting *Patel*, 574 U.S. at 420). The right to be free from a "warrantless code-compliance search with no alternative pre-compliance review was clearly established" at the time the initial inspection referenced in the Complaint occurred. *Gardner v. Evans*, 920 F.3d 1038, 1056 (6th Cir. 2019).

In this case, the plaintiff alleges that the TDCI's agent's stating to McKamey "that warrantless 'continued inspections will occur' is an invasion of Mr. McKamey's rights under the Fourth Amendment complete upon its utterance" and that defendant Lawrence, sued in his official capacity only, "is liable for his invasion and violation of Mr. McKamey's constitutional rights under the Fourth Amendment." (Compl. ¶¶ 132, 137.) But a "'suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office,' *i.e.*, against the State." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Lawrence, sued in his official capacity

only, is, like the state, entitled to sovereign immunity with respect to any claim for damages or any other form of retroactive relief unless some exception to sovereign immunity applies, and no such exception applies to this claim.

Moreover, even if McKamey could establish an exception, the Complaint's allegations do not establish that a *past* violation of his Fourth Amendment rights occurred. He alleges that "Lawrence's office conducted an inspection of Mr. McKamey's property" on November 21, 2023 (Compl. ¶ 69), but he does not allege that this search was warrantless, unreasonable, or conducted without his consent. Moreover, his Fourth Amendment claim is apparently not premised upon this inspection. Rather, it is premised upon the purported threat of future inspections. (*See* Compl. ¶¶ 75, 76 (referencing the February 2, 2024 email from the SFMO (Doc. No. 18-8), and asserting that "[t]hese threatened inspections" violate McKamey's "right to be free of warrantless searches under the Fourth Amendment").) Insofar as Count Three asserts a claim based on defendant Lawrence's office's liability for a past violation of the Fourth Amendment, the claim is subject to dismissal both on the grounds of sovereign immunity and because the allegations in the Complaint, construed liberally, fail to establish a past violation of the plaintiff's Fourth Amendment rights. Insofar as it could be construed as seeking prospective relief based on the threat of future violations, that claim is expressly raised in Count Seven, addressed below.

### 2. *Count Seven*

Count Seven of the Complaint seeks a declaration under 28 U.S.C. § 2201 to the effect that McKamey "is entitled under the Fourth Amendment to be presented a warrant supported by probable cause prior to any entry onto his property by Defendant Lawrence or his agents." (Compl. ¶ 166.)

The United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Federal courts cannot issue advisory opinions. *Arnett v.*

*Myers*, 281 F.3d 552, 562 (6th Cir. 2002). Article III's case-or-controversy requirement allows federal courts to resolve concrete disputes but prohibits them from passing "judgments on theoretical disputes that may or may not materialize." *Saginaw Cty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–03 (1998)). Thus, to have standing to bring a claim at all, a plaintiff "must allege (1) an injury in fact (2) that [is] traceable to the defendant's conduct and (3) that the courts can redress." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992)). To establish an injury in fact, the plaintiff must "show an imminent or actual injury before [entering] the federal courts." *STAT Emergency*, 946 F.3d at 954. He "cannot sue simply to avoid a '*possible* future injury.'" *Id.* at 954–55 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Moreover, a claim is not ripe if it turns on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020). The Declaratory Judgment Act "does not alter these rules or otherwise enable federal courts to deliver an expression of opinion about the validity of laws." *STAT Emergency*, 946 F.3d at 954.

With respect to Count Seven, the plaintiff has not established the existence of a "case" or controversy" entitling him to a declaration of rights. The February 2, 2024 email from the SFMO, contrary to the allegations in the Complaint, does not threaten "warrantless" searches—it states that "continued *inspections* will occur until an acceptable POCA is received, or the facility is brought into compliance with adopted codes and standards and inspected by the SFMO." (Doc. No. 18-8.) "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-00052, 2022 WL 2678733, at *5 (M.D. Tenn. July 11, 2022) (Richardson, J.) (quoting *Williams v.*

*CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)). The reference to inspections does not imply that they will be warrantless.

The plaintiff's belief that Lawrence's office intends to conduct illegal, warrantless searches of his property is speculative at best. Accepted as true, the factual allegations in the Complaint do not suggest that McKamey is imminently at risk of a violation of his constitutional rights. Instead, the plaintiff seeks to avoid a "possible future injury," and this claim turns entirely on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 592 U.S. at 131. Because the allegations in the Complaint fail to establish an injury in fact, actual or imminent, McKamey lacks standing to bring this claim at all and is not entitled to the requested declaration. This claim will be dismissed.

### 3. *Count Four*

Count Four asserts that, "[b]ut for Mr. McKamey's exercising his Fourth Amendment rights, Defendant Lawrence's office would not have stated 'continued inspections will occur' until Mr. McKamey complied with the demand for him to submit a sworn affidavit which was not required by any law in Tennessee." (Compl. ¶ 141.) Based on this assertion, the Complaint states, "[t]herefore, Defendant Lawrence is liable to Mr. McKamey for retaliation against [sic] protected conduct." (Compl. ¶ 142.) Again, Lawrence, a state official sued in his official capacity, is entitled to sovereign immunity from a claim seeking retroactive relief unless some exception applies.

Moreover, even if the plaintiff could show that some exception applied, the claim that the "threat" of "continued inspections" is in retaliation for McKamey's assertion of his Fourth Amendment rights fails to cross the threshold "from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

the line between possibility and plausibility of entitlement to relief." (quoting *Twombly*, 550 U.S. at 557)).

The entire chain of events, as revealed in the Complaint and attached exhibits (including exhibits attached to the Motion to Dismiss but referenced in the Complaint), began with an anonymous complaint about potential fire code violations, followed by an apparently consensual inspection that revealed code violations as well as evidence that McKamey was using the barn for more than simply storage. These discoveries led to a request that McKamey provide a Plan of Corrective Action to correct the identified deficiencies. (Doc. No. 18-6, at 2–4.) McKamey's proposed POCA was simply that he would "not use barn for anything besides personal storage." (*Id.* at 5.) This, however, was the same plan of action McKamey had proposed, and the SFMO had accepted, in 2019 (*see* Doc. No. 18-5, at 5) and with which McKamey was found not to be in compliance in 2023, so the SFMO's office did not accept that 2023 POCA (*see* Doc. No. 18-8). The SFMO's proposed alternative was that McKamey submit a sworn affidavit verifying that he would not use the barn or CONEX boxes for anything other than storage or that he actually correct the deficiencies. McKamey has not shown that the SFMO's office threatened warrantless inspections. The email on which he relies simply states that inspections will continue until the violations it had found were resolved. Nothing in the Complaint, aside from McKamey's sheer speculation, suggests that the choice he was given—sworn affidavit or further inspections until code compliance was established—was in retaliation for his attorney's reference to the Fourth Amendment, as opposed to a response to his violation of his 2019 POCA.

Count Four is subject to dismissal.

### 4. Count Five

Count Five of the Complaint asserts that Lawrence's office "repeatedly demanded that Mr. McKamey complete and submit a sworn affidavit attesting to the fact that four building code

violations were discovered on his property," that "no law requires this affidavit," that McKamey exercised his First Amendment right not to speak when he refused to complete the proposed affidavit, that the SFMO's statement that "'continued inspections will occur' until Mr. McKamey complied with the demand for him to submit a sworn affidavit which was not required by any law in Tennessee" would not have occurred but for McKamey's exercise of his First Amendment rights, and, therefore, that Lawrence, in his official capacity, is liable to Mr. McKamey for retaliation against protected conduct." (Compl. ¶¶ 147–52.)

Again, Lawrence, in his official capacity, is entitled to sovereign immunity from claims for damages for alleged past violations of the plaintiff's constitutional rights. Moreover, once again, the plaintiff's factual allegations fail to "nudge[] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

A First Amendment retaliation claim has three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

As set forth above, McKamey's proposed POCA was simply a statement that he "[w]ill not use barn for anything besides personal storage." (Doc. No. 18-6, at 5.) Chris Bainbridge, as Director of the Codes Enforcement Section of the Fire Prevention Division of the TDIC, responded to the proposed POCA by asking McKamey to "complete an affidavit to that effect" and return it to his office. (Doc. No. 24-5, at 3.) Although Bainbridge provided a proposed affidavit, he also gave McKamey the option of editing it or drafting his own affidavit to "support [his] POCA." (*Id.*) Contrary to the allegations in the Complaint, the documents on which McKamey relies do not

show that he was being required to admit that "four building code violations were discovered on his property." (Compl. ¶ 147.) Because he was given the option of drafting his own affidavit, he clearly had the option of drafting it to state only his verification that the TDCI agents *claimed* to have found violations to which he did not admit but that he would not use the buildings in question for anything other than storage. Moreover, it is clear that Bainbridge's communication was an attempt to settle and close the open investigation into the code violations documented during the November 21, 2023 inspection. While McKamey clearly had no obligation to sign any affidavit, whether drafted by Bainbridge or himself, neither did the TDCI's agents have an obligation to accept McKamey's proposed POCA without some additional verification that he would actually abide by it.

As for the first element of the plaintiff's *prima facie* First Amendment retaliation claim, the Sixth Circuit has not conclusively determined that the act of refusing to sign an affidavit under circumstances like those presented here qualifies as protected activity. *See Cunningham v. Blackwell*, 41 F.4th 530, 543 (6th Cir. 2022) (finding that the plaintiff's refusal to submit a statement he believed to be false "did not indisputably qualify as protected activity" (citing *Kingsley v. Brundige*, 513 F. App'x 492, (6th Cir. 2013)). Under the circumstances presented here, the court finds that the plaintiff's refusal to provide an affidavit did not implicate his rights under the First Amendment. He clearly was given the choice of what to say in an affidavit and as to whether to submit an affidavit at all.

Moreover, even assuming that he did engage in protected activity, the defendant's response to the plaintiff's refusal does not qualify as an adverse action, much less one that would deter a person of ordinary firmness from "doing whatever they were doing." *Cunningham*, 41 F.4th at 541 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337

(6th Cir. 2010)). The TDCI agents were, according to the allegations in the Complaint, acting within their authority in providing the plaintiff options for bringing his buildings into compliance. As for the third element of the *prima facie* case, temporal proximity alone, under the circumstances presented here, is simply not sufficient to give rise to an inference that there was a causal link between McKamey's purported exercise of his First Amendment rights and the TDIC's statement that, in the absence of an affidavit, further inspections would be required to establish McKamey's property's compliance with the applicable codes.

Count Five fails to state a plausible First Amendment retaliation claim.

### 5. *Count Eight*

Count Eight seeks a declaration of the plaintiff's rights under the First Amendment. McKamey seeks a declaration that he is entitled under the First Amendment not to sign a sworn affidavit and that retaliation for refusal to do so is prohibited. The demand is based on his allegations that policymakers "repeatedly demanded" that he sign a sworn affidavit admitting that building code violations were found on his property. (Compl. ¶¶ 171, 174.) For the same reasons that his First Amendment retaliation claim is subject to dismissal, the court finds that the Complaint fails to allege facts that establish that McKamey is entitled to the requested declaration, which would, even if granted, amount to nothing more than an advisory statement as to what the First Amendment generally requires.

## IV. CONCLUSION

For the reasons set forth herein, the Motion to Dismiss (Doc. No. 23) will be granted in its entirety, and the plaintiff's pending Amended Motion for Preliminary Injunction (Doc. No. 19) will be denied as moot.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge